438

[Civ. No. 5152. Fourth Dist. June 19, 1956.]

PATRICK A. CONRAD, Appellant, v. LOUIS D. VERDUSCO et al., Respondents.

Scampini, Mortara & Ertola and Angelo J. Scampini for Appellant.

Joseph L. Alioto and Walter F. Calcagno for Respondents.

BARNARD, P. J.—This is an action for damages arising out of contracts for the sale of meat. On April 17, 1951, the plaintiff entered into a contract with the defendants Gallego and Verdusco, under which they agreed to sell to him 1,500,000 pounds of Mexican-cured beef at 30 cents a pound

"for all weights shipped and as certified by the United States Customs." The contract provided that the sellers would have available for shipment not less than 60,000 pounds per week beginning May 1, 1951, and that "all shipments shall be made f.o.b. San Ysidro, California, or border"; that the plaintiff would furnish the barrels in which the beef was to be shipped, would furnish a skilled person to instruct sellers' employees in the proper method of curing the beef, and would furnish curing materials amounting to not more than 1½ cents per pound of cured beef; that the beef should comply with all government regulations pertaining to the importation of beef from Mexico; that the plaintiff would deposit in a bank a letter of credit in an amount sufficient to pay for all shipments as made, with the sellers authorized to draw thereon "when the shipment of cured beef shall pass final inspection" by the United States authorities; and that the performance by either party should be suspended "if either Mexico or the United States prevent the export or import of beef—until such restrictions be released," whereupon the agreement should be reinstated. By a supplementary agreement executed on April 18, 1951, it was agreed that the provision for a minimum delivery per week be deleted and suspended; that the plaintiff would use his best efforts to make available to the sellers a sum not exceeding $20,000 to be used for the sole purpose of purchasing cattle to conform with the agreement; and that "Upon advance or availability of the mentioned sum the clause covering the minimum amount to be delivered per week will be reinstated in the original agreement."

On April 20, 1951, the plaintiff entered into a contract with the defendant Holly Meat Packing Company, herein referred to as "Holly," in which he represented that he "is causing" 1,500,000 pounds of beef to be slaughtered and cured in Mexico, and agreed to sell this meat to Holly at 45 cents per pound, agreeing to deliver all such beef available for shipment up to 80,000 pounds per week, starting April 30, 1951. The contract provided that title was to pass to the buyer when payment was made and possession of the meat was delivered at the border; and that Holly should deposit a letter of credit with a bank at San Ysidro, upon which the seller could draw at the rate of 45 cents per pound for every shipment of such beef upon presenting to the bank certain documents.

Shortly after the execution of these contracts the plaintiff hired one Leininger to supervise the curing of the meat. Leininger moved to Tijuana where Gallego's plant was situated, and remained there until about August 15, 1951. The plaintiff also shipped to Gallego at Tijuana 195 barrels, and sufficient curing materials to start operations. He also hired a bookkeeper and a manager, and retained a brokerage firm to keep him advised of all requirements of United States authorities. Holly deposited at the bank at San Ysidro a letter of credit in the sum of $45,000, as provided in its contract with the plaintiff.

On May 7, 1951, the plaintiff was advised by his brokerage firm that no Mexican-cured beef could be imported into the United States unless it came from a Mexican federally inspected plant. It was then discovered that Gallego's plant did not comply, and that Gallego could not receive the necessary license until he built a new slaughterhouse. Gallego started to build a slaughterhouse. The plaintiff advanced about $3,700 to Verdusco and Gallego for that purpose, and also arranged for the purchase of certain machinery for the slaughterhouse costing $4,700. All of the money he put into the deal came from a group of his backers in Los Angeles. On July 7, 1951, Mexico banned the export of meat to the United States, because of an outbreak of hoof and mouth disease, and this ban was not lifted until about December 28, 1951.

Early in August, 1951, the plaintiff and Gallego had a quarrel in which Gallego accused the plaintiff of charging him $2,000 more for the slaughterhouse equipment than it had cost, as a result of which the plaintiff cancelled another contract in which he had agreed to lease this equipment to Gallego. On or about August 15, 1951, the plaintiff had another quarrel with Gallego in which the plaintiff claimed he was not obligated to furnish $20,000 for the purchase of cattle, but was only obliged to use his best effort to that end. At that time something occurred, and the evidence is conflicting as to whether the plaintiff abandoned and cancelled the original contract of April 17, 1951, or whether Gallego repudiated that contract and refused to carry it out. It appears without dispute that shortly thereafter the plaintiff proposed a new and different agreement with Gallego; that Gallego also proposed a new agrement between them; that the plaintiff submitted this proposed new agreement to his backers, who had furnished him what money he had used, and they rejected it; and that Verdusco at all times desired

to have the original contracts performed. During the fall several letters were exchanged between Gallego and counsel for the plaintiff, in which suggestions for a new arrangement were made, and in which each claimed that the other was at fault.

On November 21, 1951, Holly notified the plaintiff that it regarded its contract with him as null and void. It is admitted that Gallego received a permit to export meat to the United States sometime after November 21, 1951, and before April 8, 1952; that the embargo on the shipment of meat was lifted on December 28, 1951; that between April 10, 1952 and June 13, 1952, Holly purchased and received 426,988 pounds of meat at 47 cents a pound from "Empacadero de Tijuana," a corporation which had taken over Gallego's plant; and that Gallego was one of three stockholders in "Empacadero de Tijuana."

The plaintiff brought this action on July 21, 1952, naming as defendants Verdusco, Gallego, Holly and three of Holly's officers and directors. The first cause of action was directed to the defendants Gallego and Verdusco alone, and sought damages for the claimed breach of the contract of April 17, 1951, as supplemented on April 18, 1951. A second cause of action alleged a conspiracy between all of the defendants to defraud the plaintiff out of his expected profit from the contract of April 17, 1951, and the contract with Holly, and sought damages therefor. The third cause of action alleged a wrongful interference by Holly and its defendant officers in the contractual relation between the plaintiff and defendants Verdusco and Gallego, by which Verdusco and Gallego were induced to repudiate their contract with the plaintiff, and sought damages therefor. Answers were filed by all of the defendants except Gallego, and Verdusco also pleaded a special defense, with a cross-complaint, alleging that on August 15, 1951, the plaintiff had abandoned his contract with Verdusco and Gallego and refused to perform the same. Gallego, a resident of Mexico, was never served, did not appear in the action, and is not involved in this appeal.

At the trial, the plaintiff and two of his witnesses testified, the plaintiff read into the record the depositions of Verdusco, Charles J. Figone and Louis J. Figone, and 63 documentary exhibits were introduced of which 42 were received as plaintiff's exhibits and 21 as defendants' exhibits. The defendants introduced no other evidence, and the case was submitted. The court found. among other things, that

the officers of Holly, who were sued as defendants, acted at all times as representatives of Holly and not in their individual capacity, which was known to the plaintiff; that prior to August 16, 1951, the plaintiff abandoned his contracts of April 17 and 18, 1951, with Verdusco and Gallego; that the plaintiff was not ready and able to comply with or perform the terms of those contracts; that the plaintiff had no source of Mexican beef to deliver to Holly, other than the beef which he was to purchase from Verdusco and Gallego; that the plaintiff was not at any time ready and able to comply with or perform the terms of his contract with Holly; that Holly was at all times ready, willing and able to comply with and perform the terms of that contract; that the plaintiff had released Verdusco from any claims arising out of the contracts of April 17 and 18, 1951; that at no time did Verdusco and Gallego breach or abandon the contracts of April 17 and 18, 1951; that at no time did the defendants or any of them enter into a conspiracy to cheat and defraud the plaintiff of any purported profits, as alleged in the complaint; that at no time did Holly and its defendant officers breach any contract with the plaintiff; that at no time did these defendants enter into any course of conduct to induce Verdusco and Gallego to repudiate their contract with the plaintiff; and that the plaintiff had not sustained the burden of proof resting upon him. Judgment was entered ordering that the plaintiff recover nothing from the answering defendants, and that Verdusco recover nothing on his cross-complaint. The plaintiff has appealed from this judgment.

The appellant contends that the rules governing a nonsuit apply, since the defendant submitted the case for decision without offering additional evidence, and that the judgment must be reversed if there is any substantial evidence in favor of the plaintiff; that the essential findings as above outlined are not supported by the evidence; and that the court committed prejudicial error in denying plaintiff's motion, at the conclusion of his case, that the evidence of all declarations and admissions made by any of the defendants, out of the presence of the others, be admitted as binding upon the other defendants.

There is no merit in the contention that the rules governing a nonsuit are here applicable. Some of the plaintiff's evidence was favorable to the defendants, as was most of the evidence in the depositions read into the evidence, and there were a great number of exhibits upon which both parties

relied. While the appellant was not bound by the evidence in the depositions, since they were offered under section 2055 of the Code of Civil Procedure, the depositions constituted evidence in the case. No order of nonsuit was requested or made and the court, after weighing all of the evidence, decided the issues as questions of fact and not of law.

If the finding that the appellant abandoned his contracts with Verdusco and Gallego is sustained by the evidence that fact is conclusive as to all issues in the case. The appellant argues that there is no evidence to sustain this finding other than the statements of Verdusco contained in his deposition, and "some self-serving statements to that effect" contained in several letters written by Gallego to appellant's attorney. While there is a conflict in the evidence, Verdusco testified that the appellant on August 10, 1951, cancelled his contracts of April 17 and 18, 1951, by going to the plant on that day and telling Gallego and Verdusco that he could not comply with the contracts any longer, that he could not get any money, that he was finished, and that he said "So far as I am concerned, I am all washed up." He further testified that the appellant at that time stated that he had gone to a lot of trouble and did not want to lose out entirely, and that he would take 1 cent a pound as commission. This is somewhat confirmed by other evidence. Leininger left the plant at that time, Gallego submitted to the appellant a new proposed agreement which was rejected by appellant's backers, and the appellant later proposed a new and different agreement under which he might receive the meat. While there is no evidence that these new agreements were entered into, the appellant on August 16, 1951, wrote a letter to the president of Holly in which he stated that it was obvious that when the embargo on the importation of meat was lifted cattle prices in Mexico would rise, that in order to protect everybody the appellant had "worked out a different arrangement" with Gallego whereby the appellant was to purchase the cattle immediately, that he had also arranged to lease Gallego's entire facilities at so much per pound, and that "in other words, I would have my own cattle and my own facilities to work with." There was also evidence that the appellant's backers had quit and he had no money to go on with the deal, and many other bits of evidence which, in connection with other matters, tend to support this finding. In view of all of the evidence in this regard, there is no merit to appellant's contention that it is unbe-

lievable that he would abandon a contract which would necessarily result in a large profit to him, at a time when nothing remained for him to do. Nothing more than a conflict in the evidence appears in this connection.

In any event, the appellant could not recover on Count I since Gallego was not served and the appellant, in writing, had released Verdusco from the effect of any possible judgment against him. Whether the contracts of April 17 and 18, 1951, were abandoned by the appellant or repudiated by Gallego, it conclusively appears that the appellant was and would be unable to deliver any such meat to Holly, and that he could not recover against Holly and its officers unless the charges contained in the second or third counts were established.

While there was some evidence of statements made to Gallego and Verdusco by these agents of Holly, to the effect that the appellant was not needed in the transaction, that he was without funds, and that he could not perform the contracts, these statements were denied. At the taking of one of the depositions it was stipulated that nothing had been done by Holly to discourage the appellant's backers in connection with the deal, and at the trial the appellant testified that it developed that "the plant couldn't give any meat" and that this was not the fault of Holly. There was a mass of evidence that at all times up to late November, 1951, Holly fully cooperated with the appellant, endeavored in every way to help him straighten out his difficulties, and tried to make it possible for him to deliver the meat which it wanted and needed. The mere fact that Holly some four months later bought some meat from a different corporation, in which Gallego held some stock, is not sufficient to establish the allegations contained in Counts II and III of the complaint, especially in view of all of the other evidence. Long before that time it conclusively appeared that the appellant could not deliver the meat called for by his contract with Holly. If it be assumed that there was sufficient evidence to make prima facie proof of a conspiracy, or of a wrongful interference with the contractual relations between the appellant and Verdusco and Gallego, the court found against the appellant on those issues and those findings are abundantly supported by the evidence. Since no conspiracy was established, the court properly denied appellant's motion that certain declarations made by some of the defendants,

out of the presence of the others, be admitted as binding upon all defendants.

The appellant's attack upon the other findings is based upon conflicts in the evidence, or upon possible inferences therefrom. All of the material findings are sufficiently supported by the evidence. Aside from existing conflicts the court indicated, with great reason, that it did not believe appellant's testimony in many respects. It rather clearly appears that any possible violation of those contracts was chargeable to Gallego and not to Holly or any of its agents. The record is voluminous, there are 146 pages in the opening brief, and we have intentionally refrained from setting forth many factual details and from commenting on some of the points incidentally raised.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.